Brent Plater (CA Bar No. 209555)
Laura Horton (CA Bar No. 288725)
WILD EQUITY INSTITUTE
474 Valencia St., Suite 295
San Francisco, CA 94103
Telephone: (415) 349-5787
Facsimile: N/A
Email: bplater@wildequity.org; lhorton@wildequity.org

Attorneys for Plaintiff Wild Equity Institute

Jonathan Evans (State Bar No. 247376)
CENTER FOR BIOLOGICAL DIVERSITY
351 California St., Suite 600
San Francisco, California 94104
Telephone: (415) 436-9682
Facsimile: (415) 436-9683
Email: jevans@biologicaldiversity.org

Shana Lazerow (CA Bar No. 195491)
Roger Lin (CA Bar No. 248144)
COMMUNITIES FOR A BETTER ENVIRONMENT
1904 Franklin Street, Suite 600
Oakland, CA 94612
Telephone: (510) 302-0430
Fax: (510) 302-0438
Email: slazerow@cbecal.org; roger@cbecal.org

Attorneys for Plaintiffs Wild Equity Institute, Center for Biological Diversity, and Communities for a Better Environment

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **WILD EQUITY INSTITUTE**, a non-profit corporation, **COMMUNITIES FOR A BETTER ENVIRONMENT,** a non-profit corporation, **and CENTER FOR BIOLOGICAL DIVERSITY,** a non-profit corporation,<br><br>Plaintiff,<br>v.<br><br>**RADBACK ENERGY, INC.**, and **CONTRA COSTA GENERATING STATION LLC.,**<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1                  COMPLAINT

**INTRODUCTION**

1. This action challenges Contra Costa Generating Station LLC ("CCGS") and Radback Energy, Inc.'s ("Radback") (collectively "Defendants") failure to comply with the Clean Air Act, 42 U.S.C. §§ 7401-7671q ("CAA" or "the Act") and the Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA") (collectively "the Acts"), by commencing construction and proposed operation of the Oakley Generating Station ("OGS", formerly known as "Contra Costa Generating Station"), without the necessary permits.

2. In the United States, the combustion of fossil fuel is the largest source of $CO_2$ emissions and accounts for 80 percent of the total GHG emissions. 75 Fed. Reg. 31,514, 31,519 (June 3, 2010). More than half of the energy-related emissions in the United States come from large stationary sources such as power plants. *Id*.

3. Climate change is predicted to have a number of harmful effects on the health of people and the environment. Health impacts include intensification of: the frequency of deadly heat waves and other extreme weather events; the growth of weeds such as ragweed, whose pollen triggers allergies and exacerbates asthma; ground-level ozone production which exacerbates asthma and heart conditions among other health problems; the frequency of infectious disease outbreaks. Climate change is also predicted to disrupt ecosystems, pushing to extinction species that cannot adapt.

4. On December 7, 2009, the Administrator of the United States Environmental Protection Agency ("EPA") signed an endangerment finding regarding GHGs under Clean Air Act section 202(a):

> The Administrator found that the current and projected atmospheric concentrations of the mix of six long lived and directly emitted GHGs—$CO_2$, $CH_4$, $N_2O$, HFCs, PFCs, and SF6 (referred to as ''well-mixed greenhouse gases'' in the endangerment finding)—are reasonably anticipated to endanger the public health and welfare of current and future generations.

*Id*.

5. Based on this finding, EPA created regulations intended to curb GHG emissions. 75 Fed. Reg. 31,514 ("Tailoring Rule"). The Tailoring Rule established a phase-in schedule for

1  permitting requirements.  Phase one imposed permit requirements on sources that were already
2  otherwise subject to the Prevention of Significant Deterioration ("PSD") permitting program and
3  that had increases of 75,000 tons per year ("tpy") or more of total GHG, on a $CO_2$ equivalent
4  ("CO2e") basis.  *Id*. at 31,523.  Phase two began July 1, 2011 and extends through June 30,
5  2013.  Phase two requires new projects with the potential to emit 100,000 tpy GHGs or greater
6  to comply with the Act's PSD requirements if construction on those projects had not begun by
7  July 1.  *Id.*  ("Beginning July 1, 2011, new projects with the potential to emit GHGs of 100,000
8  tpy or greater that have not begun construction must comply with PSD requirements under the
9  Clean Air Act.")  *Id*.

10  6.  The Oakley Generating Station is a natural gas-fired, combined-cycle electrical
11  generating facility with a projected output of 624 megawatts ("MW").  Radback estimates that
12  the facility would operate up to approximately 8,463 hours per year, with an expected facility
13  capacity factor at 60 to 80 percent.  Defendants calculated OGS's CO2e emissions at
14  1,932,480.1 tpy, *twenty times* the 100,000 tpy threshold triggering the requirement of a PSD
15  permit.

16  7.  OGS's emissions are not limited to GHGs – the facility will also emit nitrogen, another
17  air pollutant.  These emissions will result in nitrogen deposition in the Antioch Dunes National
18  Wildlife Refuge.  The long-term chronic adverse biological effects of nitrogen deposition on
19  native ecosystems have been described in a number of scientific papers.  Nitrogen compounds
20  are potent fertilizers, and when nitrogen deposition occurs on nutrient-poor soils like those
21  found at the Antioch Dunes National Wildlife Refuge, non-native weeds are able to outcompete
22  the native plants that are adapted to nutrient-poor environments.  Two native species, the Contra
23  Costa Wallflower and the Antioch Dunes Evening Primrose, are protected as endangered species
24  under the federal Endangered Species Act, 16 U.S.C. §§ 1531-1544.  As the Refuge's soils
25  become fertilized, these species' last protected habitats will no longer be able to sustain them.

26  8.  A third plant species, the Naked-stem Buckwheat, is also affected by nitrogen
27  deposition. While the Naked-stem Buckwheat is not yet considered an endangered species, it is
28  the sole host plant for the critically imperiled Lange's Metalmark Butterfly.  The Lange's

1  Metalmark Butterfly is so critically endangered that a single failure in the productivity of the
2  species' host plant could lead to permanent extinction of the species.
3      9. Plaintiffs allege that CCGS and Radback's failure to apply for and receive a PSD permit,
4  as required due to the facility's anticipated GHG emissions, violates § 165(a) of the CAA. 42
5  U.S.C. § 7475(a), and that proposed operations of OGS would result in nitrogen deposition in
6  the Antioch Dunes National Wildlife Refuge and result in the "take" of and otherwise jeopardize
7  the continued existence of endangered species including the Lange's Metalmark Butterfly,
8  Contra Costa wallflower, and Antioch Dunes evening primrose in violation of the ESA.
9      10. Wild Equity Institute ("Wild Equity"), Center for Biological Diversity ("CBD") and
10 Communities for a Better Environment ("CBE") (collectively "Plaintiffs") seek an order
11 declaring that Defendants violated § 165(a) of the CAA and will violate § 9 of the ESA; an
12 order compelling Defendants to come into compliance with the CAA by obtaining a PSD
13 permit; and an order enjoining further construction of OGS until Defendants come into
14 compliance with the Acts.

## JURISDICTION AND VENUE

16     11. This court has jurisdiction over this action pursuant to 42 U.S.C. § 7604(a) (Clean Air
17 Act), 16 U.S.C. § 1540(c), (g)(1)(A) (Endangered Species Act), 28 U.S.C. § 1331 (federal
18 question), 28 U.S.C. § 2201(a) (declaratory relief), and 28 U.S.C. § 2202 (further relief).
19     12. To the extent required by the CAA, 42 U.S.C. § 7604(b)(1)(A), Plaintiffs provided
20 notice of their intent to sue by letter sent to the Defendants on December 16, 2011.  To the
21 extent required by the ESA, 16 U.S.C. § 1540(g)(2), Plaintiffs provided notice of their intent to
22 sue by letter sent to Defendants on December 19, 2011.
23     13. An actual controversy exists between the parties, as required by the Federal Declaratory
24 Judgment Act, which have adverse legal interests of sufficient immediacy and reality to warrant
25 the issuance of a declaratory judgment.  28 U.S.C. § 2201 (creation of remedy).
26     14. Venue is proper in the District Court for the Northern District of California pursuant to
27 28 U.S.C. § 1391(b)(2), 42 U.S.C. § 7604(c)(1) and 16 U.S.C. § 1540(g)(3)(A).

## INTRADISTRICT ASSIGNMENT

1  15. Assignment of this action to the San Francisco or Oakland Division is proper pursuant to
2  Local Rule 3-2(c). The action arises from activities in Contra Costa County.

### PARTIES

4  16. Plaintiff WILD EQUITY INSTITUTE is a California non-profit corporation with offices
5  in San Francisco. The Wild Equity Institute unites the grassroots conservation movement and
6  the environmental justice movement in campaigns that redress inequity, both across our human
7  communities and towards the lands in which we live. The Wild Equity Institute, its members,
8  its staff, and its board of directors have long-standing interests in the Lange's Metalmark
9  Butterfly, the Antioch Dunes Evening Primrose and the Contra Costa Wallflower, and long-
10 standing ties to the communities in Oakley, California. Specifically, the Wild Equity Institute,
11 its members, staff, and Board of Directors have specific interests in the Antioch Dunes National
12 Wildlife Refuge and the species that depend on the refuge for survival. The Wild Equity
13 Institute's members, staff, and Board of Directors regularly recreate at the Antioch Dunes
14 National Wildlife Refuge when it is opened for public use and participate in butterfly counts and
15 restoration activities on the land. The Wild Equity Institute's members, staff, and Board of
16 Directors also recreate, commute, and live near Oakley Generating Station.

17  17. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit, public interest
18 environmental organization with multiple offices throughout the United States with its
19 headquarters in San Francisco. The Center is dedicated to the protection of native species and
20 their habitats through science, policy, and environmental law. The Center has over 40,000
21 members throughout the United States, including those who would be impacted by OGS. The
22 Center and its members are concerned with the conservation of endangered species and the
23 effects of climate change. OGS will emit co-pollutants such as nitrogen into the surrounding
24 environment, threatening species like the Lange's Metalmark Butterfly, the Contra Costa
25 Wallflower and the Antioch Dunes Evening Primrose. OGS will also contribute greenhouse
26 gases that will worsen the impacts of climate change. Should the operators later increase the
27 capacity of OGS, these co-pollutants will also increase, causing further damage to CBD's
28 interests.

18. Plaintiff COMMUNITIES FOR A BETTER ENVIRONMENT is a California non-profit corporation with offices in Huntington Park, Wilmington and Oakland, California. CBE's mission is to build peoples' power in California's communities of color and low income communities to achieve environmental health and justice by preventing and reducing pollution and building green, healthy and sustainable communities and environments. CBE provides residents in blighted and heavily polluted urban communities in California with organizing skills, leadership training and legal, scientific and technical assistance, so that they can successfully confront threats to their health and well-being. Not only do GHG emissions threaten air and climate in the future, the co-pollutants will have an immediate negative impact on the air quality surrounding OGS, in communities represented by CBE.

19. Defendant Contra Costa Generating Station LLC is a limited liability corporation, wholly owned by Radback Energy, Inc., residing in Danville, California.

20. Defendant Radback Energy, Inc. is a corporation residing in Danville, California.

## THE CLEAN AIR ACT FRAMEWORK

21. Title I, Part C of the Act seeks to prevent the significant deterioration of air quality in areas of the United States that have achieved air quality standards for various air pollutants, or for areas that are unclassifiable for a criteria air pollutant. *Alabama Power Co. v. Costle,* 636 F.2d 323, 343, 343 fn.2 (D.C. Cir 1979). The primary strategy is to require new and modified sources of air pollution to apply the Best Available Control Technology for reducing air pollution. 42 U.S.C. § 7475(a)(4). To aid implementation of this technology, the Act requires facility operators to obtain a permit prior to commencing construction on all "major emitting facilit[ies]." *Id.* § 7475(a)(1).

22. The Act defines a "major emitting facility" as, *inter alia,* facilities "with the potential to emit more than two hundred and fifty tons per year or more of any air pollutant." 42 U.S.C. § 7479(1).

23. The United States Environmental Protection Agency's ("EPA") regulations further explain the kinds of emitters that fall within these provisions of the Act. The regulations refer to "major stationary source[s]," which, for purposes of this Complaint, are equivalent to major

emitting facilities. 42 U.S.C. § 7479(a); 40 C.F.R. § 52.21(b)(1). A "stationary source" is a "building, structure, facility or installation" that emits a pollutant regulated by EPA. 40 C.F.R. § 52.21 (b)(5). A "building, structure, facility or installation means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under control of the same person (or persons under common control) . . . ." 40 C.F.R. § 52.21(b)(6).

24. "Construction" is "any physical change or change in the method of operation (including fabrication, erection, installation, or modification of an emissions unit) that would result in a change in emissions." 40 C.F.R. § 52.21(b)(8).

25. Construction has "commenced," according to the CAA, when:

> the owner or operator has obtained all the necessary preconstruction approvals or permits required by Federal, State, or local air pollution emissions and air quality laws or regulations and either has (i) begun, or caused to begin, a continuous program of physical on-site construction of the facility or (ii) entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner and operator, to under take a program of construction of the facility to be completed within a reasonable time.

42 U.S.C. § 7479(2)(A).

26. Similarly, EPA's regulation defines the phrase "begin actual construction" as:

> initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying underground pipework and construction of permanent storage structures. With respect to a change in method of operations, this term refers to those on-site activities other than preparatory activities which mark the initiation of the change.

40 C.F.R. § 52.21(b)(11).

27. EPA did not regulate GHG emissions until the Supreme Court found in *Massachusetts v. EPA* that GHGs qualify as air pollutants under the Act. 549 U.S. 497 (2007). As a result, EPA made an endangerment finding for GHGs under § 202(a) of the CAA, 74 Fed. Reg. 66496 (Dec. 15, 2009), and subsequently regulated GHG emissions under the CAA through the Light-Duty Vehicle Rule. 75 Fed. Reg. 25324 (May 7, 2010). Consequently, EPA rules for PSD and other provisions became applicable to stationary sources that emit GHGs. 75 Fed. Reg. 17004 (Apr. 2, 2010); *see also* 75 Fed. Reg. at 31521-22.

28. To implement this new PSD requirement, EPA created a phase-in schedule for PSD applicability, known as the Tailoring Rule, so "that only the largest stationary sources would initially be subject to permitting requirements." *Coalition for Responsible Regulation, Inc. v. E.P.A.*, 684 F.3d 102, 113 (D.C. Cir. 2012); 75 Fed. Reg. at 31516. After this initial phase, a second phase makes new major stationary sources of GHG emissions that "have the potential to emit[] at least 100,000" tpy of carbon dioxide and carbon dioxide equivalent pollutants subject to the PSD permitting requirements. *Id*. at 31516. This phase went into effect on July 1, 2011. *Id.*

## THE ENDANGERED SPECIES ACT FRAMEWORK

29. The ESA is a comprehensive federal statute declaring that endangered and threatened species are of "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). Accordingly, the purpose of the ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species ... ." *Id*. § 1531(b).

30. Section 7 of the ESA requires all federal agencies to ensure that their actions do not "jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of a species' "critical habitat." Id. § 1536(a)(2).

31. Section 9 of the ESA prohibits the take of any species listed under the ESA. 16 U.S.C. § 1538. The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." By regulation, the Fish and Wildlife Service has further defined the term "harm" to include "significant habitat modification or degradation" that "actually kills or injures wildlife by significantly impairing essential behavioral patterns." 50 C.F.R. § 17.3. Section 9 of the ESA prohibits, among other things, "any person" from intentionally taking listed wildlife species or incidentally taking listed wildlife species without a lawful authorization from the Secretary. *Id*. §§ 1538(a)(1)(B) and 1539.

**FACTS GIVING RISE TO PLAINTIFFS' CLAIMS**

32. On June 30, 2009, CCGS filed an Application for Certification with the California Energy Commission ("CEC") to construct OGS. On May 18, 2011, the CEC gave final approval on OGS's Application for Certification. On June 1, the CEC provided Radback Energy and Pacific Gas & Electric ("PG&E") with a limited "Notice to Proceed/Start of Construction" approval for planning and very preliminary construction.

33. This facility is a natural-gas fired electrical generating facility that Defendants estimate will operate up to approximately 8,463 hours per year, with an expected facility capacity factor at 60 to 80 percent. Defendants further calculated its GHG emissions would be 1,932,480.1 tpy. These emissions levels qualify OGS as a major emitting facility. This projected annual output of GHGs is twenty times the 100,000 tpy threshold from Phase II of the Tailoring Rule.

34. Although the CEC provided Defendants with limited authority to initiate construction on June 1, 2011, Plaintiffs allege that Defendants did not commence construction until well after July 1, 2011, nor did Defendants enter into binding agreements or contractual obligations to construct OGS by July 1, 2011.

35. Because construction of OGS did not commence until well after July 1, 2011, the Act, as interpreted by EPA in the Tailoring Rule, required Defendants to apply for and receive a Prevention of Significant Deterioration permit before construction.

36. Nonetheless, subsequent to July 1, 2011 Defendants commenced construction of OGS without first receiving the requisite PSD permit.

37. Currently, the Antioch Dunes National Wildlife Refuge receives nitrogen deposition from the surrounding atmosphere at a rate above the critical load for deposition in nutrient-poor soils and deserts like those found at the Antioch Dunes National Wildlife Refuge. Operating the facility will deposit nitrogen in the vicinity of and on the Antioch Dunes National Wildlife Refuge.

**PLAINTIFFS' NOTICE OF INTENT TO SUE**

38. The CAA requires a 60-day notice of intent to sue for violations of the Clean Air Act, and Plaintiffs did so in a letter addressed to Defendants dated December 16, 2011. 42 U.S.C. §

7604(b)(1)(A). The letter alleged violations of § 165(a) of the Act. A copy was sent to the EPA Administrator for Region 9. Similarly, the ESA requires a 60-day notice of intent to sue for violations of the Endangered Species Act, 16 U.S.C. § 1540(g)(2), and Plaintiffs did so in a letter addressed to Defendants dated December 19, 2011.

**FIRST CLAIM FOR RELIEF**

**Violation Of The Clean Air Act
[42 U.S.C. § 7475(a)]
(CCGS and Radback's Failure To Apply For and Receive a PSD Permit Prior to Commencing Construction of the Oakley Generating Station)**

39. Each and every allegation set forth above is incorporated herein by reference.

40. Defendants are violating § 165(a) of the CAA and its implementing regulations by failing to apply for and receive a Prevention of Significant Deterioration Permit prior to commencing construction and operation of the Oakley Generating Station. 42 U.S.C. §§ 7475(a) & 7604(a); 40 C.F.R. part 52.

**SECOND CLAIM FOR RELIEF**

**Violation Of The Endangered Species Act
[16 U.S.C. § 1538]
(CCGS and Radback's Proposed Operations of the Oakley Generating Station)**

41. Each and every allegation set forth above is incorporated herein by reference.

42. Defendants are violating § 9 of the ESA and its implementing regulations in regards to the proposed operation of the OGS. 16 U.S.C. § 1538; 50 C.F.R. § 17.3.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1. Declare that Defendants are violating CAA § 165(a) by failing to apply for and receive a PSD permit prior to commencing construction and operation of the OGS facility, and that the proposed operations of OGS would violate ESA § 9;

2. Order Defendants to come into compliance with CAA § 165(a) by applying for a PSD permit;

3. Enjoin Defendants from further construction of the OGS facility until they have come into compliance with CAA § 165(a) and enjoin Defendants from operation of OGS until they have come into compliance with the ESA § 9;

4. Award Plaintiffs their costs and attorneys' fees, including expert witness fees; and

5. Grant Plaintiffs such other and further relief as this Court may deem just and proper.

Respectfully submitted August 21, 2013,

/s/ Brent Plater
Brent Plater (CA Bar No. 209555)
Laura Horton (CA Bar No. 288725)
WILD EQUITY INSTITUTE
474 Valencia St., Suite 295
San Francisco, CA 94103
Telephone: (415) 349-5787
Facsimile: N/A
bplater@wildequity.org

Jonathan Evans (State Bar No. 247376)
CENTER FOR BIOLOGICAL DIVERSITY
351 California St., Suite 600
San Francisco, California 94104
Telephone: (415) 436-9682
Facsimile: (415) 436-9683
Email: jevans@biologicaldiversity.org

Shana Lazerow (CA Bar No. 195491)
Roger Lin (CA Bar No. 248144)
COMMUNITIES FOR A BETTER ENVIRONMENT
1904 Franklin Street, Suite 600
Oakland, CA 94612
Telephone: (510) 302-0430
Fax: (510) 302-0438
Email: slazerow@cbecal.org; rline@cbelgal.org

Attorneys for Plaintiffs Wild Equity Institute, Center for Biological Diversity, and Communities for a Better Environment

In accordance with Local Rule 5-1(i)(3) I attest that concurrence in the filing of the document has been obtained from each of the other signatories.

/s/ Jonathan Evans